Etim U. AKA, Appellant,

v.

WASHINGTON HOSPITAL
CENTER, Appellee.

No. 96–7089.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 31, 1997.

Decided June 20, 1997.

James L. Kestell, Washington, DC, argued the cause and filed the briefs, for appellant.

Henry Morris, Jr., argued the cause, for appellee, with whom Anne M. Hamilton and Stewart S. Manela, were on the briefs. Samuel K. Charnoff, Washington, DC, entered an appearance, for appellee.

Barbara L. Sloan, Attorney, Washington, DC, Equal Employment Opportunity Commission, argued the cause and filed the brief, for amicus curiae.

Before: WALD, HENDERSON and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Opinion concurring in part and dissenting in part filed by Circuit Judge HENDERSON.

WALD, Circuit Judge:

On March 29, 1996, the district court granted summary judgment to Washington Hospital Center ("Washington Hospital") in this action alleging employment discrimination in hiring and transfer decisions based on disability, age, and national origin. *See Aka v. Washington Hosp. Ctr.*, Civ. No. 94–1281, 1996 WL 435026 (D.D.C. March 29, 1996). The appellant, Etim U. Aka, now challenges that grant of summary judgment to Washington Hospital, as well as the denial of his own motion for summary judgment on one of his claims. We hold that the district court erred in granting summary judgment to Washington Hospital with regard to one of the challenged hiring decisions, and with regard to Aka's claim that Washington Hospital has failed to satisfy its obligation under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("the ADA") to offer Aka a "reasonable accommodation" to his disability, and we remand the case for trial of these claims; we affirm the district court's grant of summary judgment to Washington Hospital with regard to Aka's remaining claims.

## I. BACKGROUND

Etim U. Aka, a 55–year–old man born and raised in Nigeria, began working for Washington Hospital as an Operation Room Orderly in 1972, two years after he emigrated from Nigeria to the United States. His orderly job, which involved transporting patients and other materials to and from Washington Hospital's operating room, required substantial amounts of heavy lifting and pushing. Aka worked as an orderly for Washington Hospital for twenty years, maintaining a good employment record and earning a Bachelor's Degree and a Master's Degree in Health Service Management to boot. As an orderly, Aka was a member of the bargaining unit represented by the Service Employees International Union Local 722.

Aka took a medical leave of absence beginning on August 22, 1991, giving diabetes as the reason. He returned to work on October 1, 1991, but then was hospitalized four days later, for a heart condition. Aka underwent bypass surgery in November, and was in rehabilitation for several months afterward. In late November, a Personnel Relations Representative from Washington Hospital visited Aka and advised him to apply for another medical leave of absence, which he did. Washington Hospital granted his request, retroactive to October 5, 1991. In April of 1992, Aka's doctor released him from the hospital and instructed him to avoid activity requiring more than a "light or moderate level of exertion." Aka sought a new job at the hospital which would be consistent with this limitation, but Washington Hospital informed him that none were available, and placed him on an eighteen-month "job-search leave" retroactive to April 7, 1992; this status permitted Aka to retain his seniority and to receive the preference accorded to Washington Hospital employees when competing for positions with non-employee applicants. (Had Aka instead continued on regular medical leave past October 5, 1992, Washington Hospital would at that point have been entitled under the collective bargaining agreement to treat Aka's leave of absence as a resignation.) The Personnel Relations Representative informed Aka that it was his responsibility to review Washington Hospital's job postings and to apply for any vacant jobs that interested him.

In early 1993, Aka applied for a Financial Manager position that paid a higher salary than his orderly position, but Washington Hospital did not give him an interview. The Personnel Relations Representative advised Aka to apply for lower-paying positions, specifically suggesting the positions of File Clerk and Unit Clerk. Aka applied for the position of Central Pharmacy Technician in May of 1993; this position involved a variety of clerical tasks related to the filling of prescriptions, such as patient census checks, charge processing, and stock replacement. Washington Hospital's Assistant Director of Pharmacy Clinical Services interviewed Aka for this position, but gave the job to employee Jaime Valenzuela instead.

In July of 1993, four vacancies opened up in the position of File Clerk. The File Clerk position entailed an array of clerical duties, such as updating insurance, preparing bills and reports, and classifying, indexing, and purging documents. Aka applied for these File Clerk positions in early July. Washington Hospital's Supervisor of Credit and Collections interviewed Aka for these positions, but did not select him for any of them; she instead selected two other employees and two non-employee applicants. Aka filed a grievance and complained to the union about the selection of non-employee applicants over employee applicants, which he believed violated the collective bargaining agreement, and the union filed a class grievance on this ground on behalf of Aka and another employee who had applied for these jobs. Before the Arbitrator ruled on these grievances, Washington Hospital agreed to remove the two non-employee hires from these jobs and replace them with employee applicants; but still did not give any of these positions to Aka. The union continued to press the grievances, however, and on November 17, 1994, the Arbitrator issued an opinion holding that Washington Hospital had not violated the collective bargaining agreement by choosing other employee applicants over Aka. The Arbitrator noted that the Union had "correctly" required Washington Hospital to remove the two outside hires because

hiring them had violated the collective bargaining agreement, Joint Appendix ("J.A.") at 288, but held that Washington Hospital had sufficient reason to find that Aka had less relevant experience than the other employee applicants eventually selected for these jobs, and thus was not obliged by the collective bargaining agreement to give the job to Aka, despite his greater seniority. The Arbitrator acknowledged that Aka had "the necessary minimal qualifications to be considered for the job," had a "solid" evaluation and "good marks" for his ability to work with peers, and was "a highly intelligent and motivated man" who "could be expected to grasp the technical aspects of the job quite readily," but found that he had less experience in billing services and office clerical environments than the employee applicants who were selected. *Id.* at 289. Aka continued to apply for other posted positions, including File Clerk and Unit Clerk positions, but he was not invited to interview for any of these positions.

On June 9, 1994, Aka filed a complaint in the United States District Court for the District of Columbia, alleging that Washington Hospital's failure to place him in the Central Pharmacy Technician or File Clerk positions constituted discrimination on the basis of his disability and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the ADA [1]; discrimination on the basis of his age in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("the ADEA"), and a failure to reinstate him after his medical leave in violation of the District of Columbia Family and Medical Leave Act, D.C. CODE ANN. § 36–1301 *et seq.*[2] The district court granted Washington Hospital's motion for summary judgment with regard to all of Aka's claims on March 29, 1996.

## II. DISCUSSION

A party's motion for summary judgment on a claim should not be granted unless the moving party demonstrates that the other party has failed to present a genuine issue of material fact with regard to that claim, and that the movant is entitled to prevail as a matter of law. *See* FED.R.CIV.P. 56(C); WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2711, at 555 (2d ed.1983). When the party against whom summary judgment is granted appeals to this court, we review the trial court's grant of summary judgment *de novo;* we uphold the grant of summary judgment only if the record, viewed in the light most favorable to the party against whom summary judgment was granted, indicates that the non-moving party presented no genuine issue as to any material fact, and that on the basis of the record evidence no reasonable factfinder could have returned a verdict for the non-moving party. *See, e.g., Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994). If we find that, viewed in this light, the record indicates that the non-moving party has presented genuine issues of material fact relevant to the claim, we must reverse the grant of summary judgment and remand the matter so that the factfinder can resolve those issues.

Our review of grants of summary judgment on claims of employment discrimination involves two further considerations. First, because employment discrimination claims center on the issue of an employer's intent, and "writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers," *Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1224 (2d Cir.1994), an added measure of "rigor," *McCoy v. WGN Continental Broadcasting Company,* 957

1. Although in his complaint Aka improperly submitted that Washington Hospital's disability-based discrimination had violated his rights under Title VII (rather than under the ADA), Washington Hospital acknowledged in its motion for summary judgment that Aka's claim "apparent[ly]" described a violation of the ADA, J.A. at 31 n.1, and the district court treated this part of Aka's complaint as a claim brought under the ADA.

2. Aka concedes that the district court's grant to Washington Hospital of summary judgment on his claim based on the District of Columbia Family and Medical Leave Act was appropriate, and does not appeal that portion of the district court's order. *See* Brief of Appellant Etim U. Aka at 7 n.1.

F.2d 368, 371 (7th Cir.1992), or "cautio[n]," *Gallo,* 22 F.3d at 1224, is appropriate in applying this standard to motions for summary judgment in employment discrimination cases. Courts reviewing such motions must bear in mind that a factfinder could infer intentional discrimination even in the absence of crystal-clear documentary evidence filed at the summary judgment stage. *See, e.g., Devera v. Adams,* 874 F.Supp. 17, 21 (D.D.C.1995); *Ross v. Runyon,* 859 F.Supp. 15, 21–22 (D.D.C.1994), *aff'd,* 1995 WL 791567 (D.C.Cir. Dec.7, 1995). The district court correctly adopted this heightened standard in its memorandum opinion, noting that "[i]n discrimination cases summary judgment must be approached with special caution...." *Aka,* 1996 WL 435026 at *4.

Second, when deciding whether a plaintiff alleging unlawful employment discrimination has presented sufficient evidence to survive a summary judgment motion, we must consider the evidence in light of the three-part procedure set out for such claims by the Supreme Court's decision in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as well as the Court's elaborations on that procedure in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *Saint Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

In *McDonnell Douglas,* the Court established a three-part protocol governing the order and burdens of proof in cases alleging discrimination in violation of Title VII. First, the complainant must establish a *prima facie* case of prohibited discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1825. If he succeeds, the burden then shifts to the employer to articulate legitimate, nondiscriminatory reasons for the challenged action. *See id.* Should the employer succeed in presenting such reasons, the burden then returns to the complainant, who must prove that the employer's proffered reasons for the challenged actions were merely a pretext for unlawful discrimination. *See id.* at 804–05, 93 S.Ct. at 1825–26. In *Burdine,* the Court held that in producing nondiscriminatory reasons for its challenged

action, the employer is not obligated to support these reasons with objective evidence sufficient to satisfy the "preponderance of the evidence" standard, *see Burdine,* 450 U.S. at 259–60, 101 S.Ct. at 1096–97, and that the plaintiff at all times retains the ultimate burden of persuasion. *See id.* at 253, 101 S.Ct. at 1093.

In the litigation underlying *Saint Mary's Honor Center v. Hicks,* Melvin Hicks sued his former employer, Saint Mary's Honor Center, alleging that Saint Mary's had discharged him because of his race, thereby violating Title VII. *See Hicks,* 509 U.S. at 505, 113 S.Ct. at 2746. After a full bench trial, the district court found that the reasons the employer had proffered as nondiscriminatory motivations for its decision to terminate the plaintiff were not the real reasons behind that decision. *See id.* at 508, 113 S.Ct. at 2748. But the district court went on to hold that the plaintiff had not proven that his race was the actual factor motivating that decision. *See id.* Thus, the district court found in favor of the employer based upon its factual findings and upon its understanding of the legal significance of those findings. The Eighth Circuit set aside the district court's determination, explaining that the district court had misunderstood the legal consequences of its factual findings. Specifically, the Eighth Circuit held that once the district court had found that the employer's proffered nondiscriminatory reasons for the challenged decision were not the real reasons motivating that decision, the district court should have gone no further, because once the factfinder has rejected the employer's proffered nondiscriminatory reasons for its challenged action, the plaintiff is entitled to judgment as a matter of law. *See id.*

The Supreme Court in *Hicks* rejected the Eighth Circuit's interpretation of the *McDonnell Douglas* framework. The Court held that, under the proper understanding of that framework, "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *Id.* at 511, 113 S.Ct. at 2749. Thus, the Supreme

Court established that, when presented with sufficient evidence to find both that the plaintiff has made a *prima facie* case and that the employer's proffered nondiscriminatory reasons for the challenged actions were not credible, the factfinder can properly find that the defendant employer has intentionally discriminated against the plaintiff. The Court repeated this principle twice more in the sentence following the one quoted above, saying: "[R]ejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination," and: "[U]pon such rejection, [n]o additional proof of discrimination is *required,*" *id.* (footnote, citation, and internal quotation marks omitted), and then once more in a footnote: "[R]ejection of the defendant's proffered reasons is enough at law to *sustain* a finding of discrimination. . . ." *Id.* at 511 n. 4, 113 S.Ct. at 2749 n. 4. *See also* Deborah C. Malamud, *The Last Minuet: Disparate Treatment after* Hicks, 93 MICH. L. REV. 2229, 2307 n.253 (1995) ("[T]he *Hicks* majority goes out of its way to say that the factfinder *is* permitted to find for the plaintiff on no more than proof of the prima facie case and disbelief of the plaintiff's reasons.").[3]

With the *Hicks* principle firmly in one hand, and the fundamentals of summary judgment in the other, our role in reviewing a grant of summary judgment to the employer in an employment discrimination case is clear: We must set aside the grant of summary judgment to the employer if the record indicates that the plaintiff presented sufficient evidence to cause a reasonable factfinder to find that the plaintiff had a *prima facie* case, and that the employer's proffered nondiscriminatory reasons for its actions

were not credible; when presented with such evidence, the factfinder may properly find for the plaintiff, and we have no power to snatch away from the factfinder crucial factual determinations that it is expressly permitted to make. *See United States v. General Motors Corp.,* 518 F.2d 420, 441 (D.C.Cir.1975) ("[L]itigants may not be cut off from their right to trial 'if they really have issues to try.' ") (quoting *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 729, 88 L.Ed. 967 (1944)); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); WRIGHT ET AL., *supra,* § 2716, at 654–55.

Two of this court's recent decisions have interpreted *Hicks* in precisely this fashion. In *Barbour v. Merrill,* 48 F.3d 1270 (D.C.Cir.), *cert. granted in part,* —— U.S. ——, 116 S.Ct. 805, 133 L.Ed.2d 752 (1996), *cert. dismissed,* —— U.S. ——, 116 S.Ct. 1037, 134 L.Ed.2d 113 (1996), and *Kolstad v. American Dental Association,* 108 F.3d 1431 (D.C.Cir.1997), *rehearing in part granted on other grounds,* (May 28, 1997) (Nos.96–7030, 96–7047), we observed that the *Hicks* Court established that a factfinder may infer discrimination based upon the combination of the plaintiff's *prima facie* case and the plaintiff's presentation of evidence sufficient to "discredit" the employer's proffered nondiscriminatory reasons for its challenged action, and concluded that, under *Hicks,* a defendant's motion for judgment as a matter of law[4] must not be granted when the plaintiff

---

**3.** The four dissenting Justices in *Hicks* had no quarrel with the majority's statements excerpted here; rather, they would have tipped the balance further toward the *plaintiffs* in employment discrimination cases than did the majority, by affirming the Eighth Circuit's interpretation of *McDonnell Douglas* and *Burdine. See Hicks,* 509 U.S. at 525–43, 113 S.Ct. at 2756–66 (Souter, J., dissenting) (joined by White, Blackmun, and Stevens, JJ.).

**4.** In *Barbour* and *Kolstad,* we reviewed district court denials of defendants' post-trial motions for judgment as a matter of law. *See Barbour,* 48 F.3d at 1274; *Kolstad,* 108 F.3d at 1435. We

consider *Barbour* and *Kolstad* apposite to the case at bar, insofar as the standard applicable to summary judgment motions "mirrors the standard for a directed verdict [also known as 'judgment as a matter of law'] under Federal Rule of Civil Procedure 50(a) . . . The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted.' " *Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511–12 (quoting *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745 n. 11, 103 S.Ct. 2161, 2171 n. 11, 76 L.Ed.2d 277 (1983)).

has presented such evidence. *Kolstad,* 108 F.3d at 1436–37 (quoting *Barbour,* 48 F.3d at 1277).[5] In so construing *Hicks, Barbour* and *Kolstad* mirror the straightforward interpretation of that decision's clear language that has been adopted by all but two of the federal circuit courts, as well as by the government agency charged with enforcement of the employment discrimination laws. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1529 (11th Cir.1997) ("Based on the Supreme Court's clear statement in the majority opinion in *Hicks,* read together with the rationale of the dissenting justices, we understand the *Hicks* Court to have been unanimous that disbelief of the defendant's proffered reasons, together with the prima facie case, is sufficient circumstantial evidence to support a finding of discrimination. Therefore, it follows from *Hicks* that a plaintiff is entitled to survive summary judgment, and judgment as a matter of law, if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action."); *Sheridan v. E.I. Du-Pont de Nemours and Co.,* 100 F.3d 1061, 1067 (3d Cir.1996) *(en banc), cert. denied,* —— U.S. ——, 117 S.Ct. 2532, —— L.Ed.2d —— (1997) ("[A] plaintiff may survive summary judgment ... if the plaintiff produced sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action."); *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995) ("If the plaintiff succeeds in showing a prima facie case and presents evidence that the defendant's proffered reason for the employment decision was pretextual—i.e., unworthy of belief, the plaintiff ... is entitled to go to trial."); *Perdomo v. Browner,* 67 F.3d 140, 145 (7th Cir.1995) ("Because a factfinder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes a summary judgment."); *EEOC v. Ethan Allen, Inc.,* 44 F.3d 116, 120 (2d Cir.1994) (vacating a grant of judgment as a matter of law to the defendant, on the ground that the plaintiff had presented sufficient evidence to permit a reasonable factfinder to "reject [the] defendant's proffered reasons for [the] challenged employment action and thus [to make] the ultimate inference of discrimination."); *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1083 (6th Cir.1994) (quoting *Gaworski v. ITT Commercial Fin. Corp.,* 17 F.3d 1104, 1109 (8th Cir.), *cert. denied,* 513 U.S. 946, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994)); *Gaworski,* 17 F.3d at 1110 ("The elements of the plaintiff's prima facie case are ... present and the evidence is sufficient to allow a reasonable jury to reject the defendant's non-discriminatory explanations. The 'ultimate question' of discrimination must therefore be left to the trier of fact to decide."); *Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1316 (4th Cir.1993) (noting that a defendant in an employment discrimination case can obtain summary judgment "in one of two ways. He can demonstrate that the plaintiff's proffered evidence fails to establish a prima facie case, or, if it does, the defendant can present evidence that provides a legitimate nondiscriminatory explanation *about which the plaintiff does not create a factual dispute."*) (emphasis added); *Washington v. Garrett,* 10 F.3d 1421, 1433 (9th Cir.1993) ("If a plaintiff succeeds in raising a genuine factual issue regarding the authenticity of the employer's stated motive, summary judgment is inappropriate, because it is for the trier of fact to decide which story is to be believed."); *Sheridan,* 100 F.3d at 1068 (stating that the position taken by the Equal Employment Opportunity Commission ("EEOC") as *amicus curiae* comported with its holding).

We acknowledge that our colleague's proposed contrary reading of *Hicks, see* opinion concurring in part and dissenting in part ("partial dissent") at 897–902, is not entirely novel, inasmuch as it reflects the approach taken by two of our sister circuits and advocated in a 1995 law review article, but we do

---

**5.** Although in these cases we "speculate[d]" about the reasoning that the juries might have followed in returning verdicts for the plaintiff, we were careful in each case to note that such speculation was unnecessary to our decisions because of *Hicks. See Barbour,* 48 F.3d at 1277 ("[W]e need not speculate about the jury's reasoning...."); *Kolstad,* 108 F.3d at 1437 ("As in *Barbour* ... we need not speculate about the jury's reasoning....").

not find in these contrary sources any compelling reason to abandon *Barbour* and *Kolstad* and depart from the plain language of the *Hicks* opinion. *Cf.* partial dissent at 899–900 (citing *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir.1996) (*en banc*), *LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 843 (1st Cir.), *cert. denied,* 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994), and Malamud, *supra,* at 2307–11).

In *Rhodes,* the Fifth Circuit announced an interpretation of *Hicks* that was not necessary to the resolution of that case, but that it has since followed in reviewing the sufficiency of the evidence in discrimination cases, *see, e.g., Grimes v. Texas Department of Mental Health,* 102 F.3d 137, 143 (5th Cir. 1996); under this interpretation, a court may grant summary judgment to a defendant even if the plaintiff has presented sufficient evidence to establish a *prima facie* case and to enable a reasonable factfinder to conclude that the employer's proffered reasons were not the real reasons motivating the challenged action, if the court finds that the evidence is nevertheless insufficient to support a reasonable inference that the action was motivated by discriminatory animus. *See Rhodes,* 75 F.3d at 994. While the Supreme Court stated that "rejection of the defendant's proffered reasons *will permit* the trier of fact to infer the ultimate fact of intentional discrimination," *Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749 (first emphasis added), the *Rhodes* court declared that "the evidence allowing rejection of the employer's proffered reasons *will often, perhaps usually, permit* a finding of discrimination without additional evidence." *Rhodes,* 75 F.3d at 994 (emphasis added). The *Rhodes* court offered

two reasons for its departure from the plain language of *Hicks*—the first adopted from Professor Malamud's law review article, *see* Malamud, *supra,* and the second from the First Circuit's *dictum* in footnote three of *Woods v. Friction Materials, Incorporated,* 30 F.3d 255 (1st Cir.1994) (discussed *infra*). *See Rhodes,* 75 F.3d at 994. We think it telling that Professor Malamud proffers her theory about the meaning of *Hicks* only after banishing to a footnote the *Hicks* majority's three clearest statements regarding the quantum of evidence sufficient to permit a finding of intentional discrimination—although not without acknowledging (in the footnote) that by these statements the Court "goes out of its way to say that the factfinder *is* permitted to find for the plaintiff on no more than proof of the prima facie case and disbelief of the plaintiff's reasons." Malamud, *supra,* at 2307 n. 253.

Like the Fifth Circuit, the First Circuit developed its approach to interpreting *Hicks* by first announcing it in *dicta,* and then following this *dicta* in subsequent decisions. In *Woods,*[6] the First Circuit reviewed a district court's grant of summary judgment to the defendant on claims of illegal discrimination on the basis of race, age, and handicap. *See Woods,* 30 F.3d at 257. The court concluded that the plaintiff had failed to present evidence sufficient to discredit the defendant's proffered nondiscriminatory reasons in the mind of a reasonable factfinder. *See id.* at 262. Although it was therefore unnecessary to do so, the court declared (in a footnote) that *Hicks* did not preclude summary judgment for the defendant in cases in which the plaintiff's evidence *is* sufficient to discredit the defendant's proffered nondiscrimi-

---

**6.** Our colleague seeks support in the First Circuit's earlier decision in *LeBlanc,* but no support for her position can be found there. *Cf.* partial dissent at 899–900 (citing *LeBlanc*). In *LeBlanc,* the First Circuit stated that after *Hicks,* a plaintiff seeking to survive the defendant's summary judgment motion must present adequate direct or circumstantial evidence to enable a reasonable factfinder to find that the defendant's challenged action was motivated by discriminatory animus. *See id.* at 843. But the *LeBlanc* court expressly treated evidence discrediting the defendant's proffered nondiscriminatory reasons as circumstantial evidence of discriminatory animus. *See id.* at 845–47. Of course, this aspect of *LeBlanc*

conflicts sharply with our colleague's repeated assertions that Aka's evidence discrediting Washington Hospital's proffered nondiscriminatory reasons for choosing Valenzuela over him did *not* constitute evidence of discriminatory animus. *Cf.* partial dissent at 898–900, 902. The *LeBlanc* court went on to hold that the plaintiff had not presented sufficient evidence to discredit the defendant's proffered reasons in the mind of a reasonable factfinder, thereby leaving open the question of whether a plaintiff who *does* present sufficient evidence to discredit the defendant's proffered reasons must survive the defendant's summary judgment motion. *See LeBlanc,* 6 F.3d at 846–47.

natory reasons in the mind of a reasonable factfinder. *See id.* at 260–61 n. 3. The First Circuit has since relied upon the *Woods* footnote to affirm summary judgment for defendants based on the conclusion that the plaintiff failed to provide sufficient evidence to enable a reasonable factfinder to find discriminatory animus, without inquiring into whether the plaintiff had provided sufficient evidence to discredit the defendant's proffered nondiscriminatory reasons. *See, e.g., Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 38–42 (1st Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996). The rationale offered in the First Circuit's *Woods* footnote for departing from the plain language of *Hicks* is that, hypothetically, the evidence before the factfinder in a particular case could not only permit the factfinder to conclude that the defendant's proffered reasons for its action were not the real reasons, but could also compel the factfinder to conclude that the action was motivated by another, nondiscriminatory reason that the defendant preferred not to disclose. Thus, for example, if the employer's true motivation was a desire to shield its own acts of embezzlement, the employer might choose to proffer alternative explanations which the plaintiff could succeed in debunking, and yet such overwhelming evidence of the defendant's embezzlement-shielding motivation could spill into the record that no reasonable factfinder could infer that the defendant was motivated by discriminatory animus. *See Woods,* 30 F.3d at 260–61 n. 3. We note, first, that the *Woods* footnote's hypothetical seems extraordinarily unlikely: When both parties in the litigation prefer to exclude evidence supporting a certain conclusion, how might the record nevertheless become inundated with such overwhelming evidence of it that no reasonable factfinder could *avoid* reaching that conclusion? Aside from its improbability, the *Woods* footnote's hypothetical is irrelevant to the *Hicks* standard, because that standard defines the quantum of evidence that is *sufficient* to permit a jury to find intentional discrimination—it establishes that "[n]o additional proof of discrimination is *required*" after that threshold has been crossed, *Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749 (internal quotation marks omitted); the

possibility that overwhelming evidence of extraneous propositions that neither party has sought to support might nevertheless come before the factfinder does nothing to alter such a standard.

■ Although our duty to follow a rule of law proclaimed by the Supreme Court does not turn on our agreement with the rule, we are comfortable that our colleague's attacks on what we and the majority of our sister circuits perceive to be the *Hicks* standard do not reveal any illogic or illegality in our perception of that case's meaning. Our colleague's central assumption appears to be that the *Hicks* standard permits a finding of discrimination based on no relevant evidence at all, because even a plaintiff who has made a *prima facie* case and discredited the employer's proffered nondiscriminatory reasons has not necessarily presented any evidence that the employer's true motivation was discriminatory animus. *See, e.g.,* partial dissent at 899 ("One searches the majority opinion in vain ... for any analysis of the connection between Aka's attack on Washington Hospital's proffered reasons and his evidence of 'unlawful discrimination.'"). We disagree. As Chief Judge Posner has observed in decisions rendered both before and after *Hicks,* the "common sense behind the rule of *McDonnell Douglas*" is that "[i]f the only reason an employer offers for firing an employee is a lie, the inference that the real reason was a forbidden one ... may rationally be drawn." *Shager v. Upjohn Co.,* 913 F.2d 398, 401 (7th Cir.1990) (Posner, J.). That is, the fact that the employer meets the plaintiff's *prima facie* case only with nondiscriminatory motivations that are "unworthy of belief" constitutes circumstantial evidence of the fact that discriminatory animus was the employer's true motivation. *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1397 (7th Cir.1997) (Posner, C.J.). In a case decided long before *Hicks,* then-Justice (now Chief Justice) Rehnquist made the same observation: "[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an imper-

missible consideration such as race." *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978); *see also Wallace,* 103 F.3d at 1400 (citing *Furnco*); *Sheridan,* 100 F.3d at 1069 (same); Catherine J. Lanctot, *The Defendant Lies and the Plaintiff Loses: The Fallacy of the 'Pretext–Plus' Rule in Employment Discrimination Cases,* 43 HASTINGS L.J. 57, 111– 35 (1991). Not only is this insight perfectly consistent with logic and with "common experience," *Furnco,* 438 U.S. at 577, 98 S.Ct. at 2949, it is the linchpin without which the *McDonnell Douglas* burden-shifting procedure would be virtually pointless—after all, the "entire purpose" of the *McDonnell Douglas* procedure is "to compensate for the fact that direct evidence of intentional discrimination is hard to come by." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 271, 109 S.Ct. 1775, 1802, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring); *see also TWA v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 622, 83 L.Ed.2d 523 (1985) ("The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the plaintiff has his day in court despite the unavailability of direct evidence.") (internal quotation marks omitted); *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes."). Thus, because evidence sufficient to establish the plaintiff's *prima facie* case and to discredit the defendant's proffered nondiscriminatory reasons *is* evidence sufficient to permit the factfinder to find intentional discrimination, and because "if the inference of improper motive *can* be drawn, there must be a trial," *Shager,* 913 F.2d at 401, summary judgment for the defendant must not be granted when such evidence has been presented.

Our colleague also seeks to impugn the *Hicks* standard by pointing out that certain types of non-credible proffered reasons might be "more probative" of discrimination than others, and might therefore allow the factfinder to infer intentional discrimination "more readily." Partial dissent at 898. Of course, we have no power to bar the factfinder from making permissible inferences simply because we suspect that those inferences

are "less readily" made than others. Rather, a claim may be withheld from the factfinder by summary judgment only if the plaintiff has failed to create a genuine issue of material fact with regard to that claim. *See* FED. R. CIV. P. 56(c). A material fact certainly can be "in issue" even when a judge believes that one conclusion regarding that fact might be drawn "more readily" than another.

Thus, the fundamental soundness of the *Hicks* standard, together with the clarity and repetition attending the Supreme Court's articulation of it, most probably accounts for the fact that all but two of our sister circuits and the EEOC have joined us in our "spectacular wrong turn." Partial dissent at 897– 98.

Although the *McDonnell Douglas* decision dealt explicitly only with Title VII, this court has held that the *McDonnell Douglas* framework also applies to ADEA cases, *see Koger v. Reno,* 98 F.3d 631, 633 (D.C.Cir.1996) (citing *Arnold v. United States Postal Serv.,* 863 F.2d 994, 996 (D.C.Cir.1988)). Some controversy exists regarding whether, and to what extent, the *McDonnell Douglas* framework applies also to discrimination claims brought under the ADA. The Third, Fourth, Fifth, Seventh, and Eighth Circuits have held that the *McDonnell Douglas* standard is applicable to ADA cases. *See Price v. S–B Power Tool,* 75 F.3d 362, 364–65 (8th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 274, 136 L.Ed.2d 197 (1996); *Daigle v. Liberty Life Ins. Co.,* 70 F.3d 394, 396 (5th Cir.1995); *Newman v. GHS Osteopathic, Inc.,* 60 F.3d 153, 156–58 (3d Cir.1995); *De-Luca v. Winer Indus., Inc.,* 53 F.3d 793, 797 (7th Cir.1995); *Ennis v. National Ass'n of Business and Educational Radio, Inc.,* 53 F.3d 55, 57–58 (4th Cir.1995). However, as some of these courts (as well as some commentators) have observed, there are significant differences between certain types of disability-based discrimination and other categories of employment discrimination, and thus the *McDonnell Douglas* framework should not be reflexively applied to ADA cases, but should be preceded by a careful consideration of its appropriateness to the particular disability discrimination claim before the court. *See, e.g., Ennis,* 53 F.3d at 57–58 (observing that courts have applied

the *McDonnell Douglas* standard in ADA cases "at least in those circumstances where the defendant disavows any reliance on discriminatory reasons for its adverse employment action"); *see also* Kevin W. Williams, Note, *The Reasonable Accommodation Difference: The Effect of Applying the Burden Shifting Frameworks Developed Under Title VII in Disparate Treatment Cases to Claims Brought Under Title I of the Americans with Disabilities Act*, 18 BERKELEY J. EMP. & LAB. L. 98 (1997) (arguing that the *McDonnell Douglas* framework should be applied to ADA cases wherein the employer's explanation for the challenged action is wholly unrelated to the plaintiff's disability, but that a different standard should apply to cases in which the employer acknowledges having taken the plaintiff's disability into account).

 This court has not directly addressed the question of the applicability of the *McDonnell Douglas* framework to ADA cases, but in *Barth v. Gelb,* 2 F.3d 1180, 1186 (D.C.Cir.1993), we suggested that the *McDonnell Douglas* standard was applicable to certain types of claims brought under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* The Rehabilitation Act of 1973 is fundamentally similar to the ADA except for the facts that the latter extends to private, as well as public, employers, and that the ADA includes an express listing of suggested "reasonable accommodations." *Compare* 42 U.S.C. § 12102(2) (defining the term "disability") *with* 29 U.S.C. § 706(8)(B) (defining the term "individual with a disability"); *compare* 42 U.S.C. § 12112(a) (outlawing disability-based employment discrimination) *with* 29 U.S.C. § 794(a) (outlawing disability-based discrimination in federally-funded programs); *see* 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 . . . ."). In *Gelb,* we noted that a Rehabilitation Act claim may be substantially unlike a Title VII claim, in that the employer may acknowledge having taken the plaintiff's disability into account when making the challenged decision. *See Gelb,* 2 F.3d at 1186. But we also observed that when the employer claims to have taken the challenged action for reasons unrelated to the plaintiff's disability, the case involves "the sort of inquiry into subjective facts—the employing agency's true motivation—that the [*McDonnell Douglas*] three-step approach was designed to address." *Id.* Because Washington Hospital asserts that Aka's disability was not a factor in the challenged hiring decisions, we find that the application of the *McDonnell Douglas* framework to Aka's ADA-based challenges to Washington Hospital's hiring decisions is appropriate.

### A. The Central Pharmacy Technician Hiring Decision

Aka first argues that he presented sufficient evidence to survive Washington Hospital's motion for summary judgment on his claims that Washington Hospital had violated his rights under Title VII, the ADEA, and the ADA by failing to hire him for the job of Central Pharmacy Technician. Washington Hospital does not contest Aka's *prima facie* showing regarding this hiring decision, *see* Brief of Appellee Washington Hospital Center at 24 n.5, so we turn to the second two stages in the *McDonnell Douglas* framework to determine whether summary judgment was appropriate. Washington Hospital proffered two nondiscriminatory reasons for its decision to hire Jaime Valenzuela for this position instead of Aka. First, the Washington Hospital official who made this hiring decision stated in an affidavit that she thought Valenzuela was more qualified for the Central Pharmacy Technician position because Valenzuela had performed volunteer work in a pharmacy and had learned medical terminology in a prior position as a Route Service Representative for a medical laboratory. Second, the official stated that Valenzuela had demonstrated greater "motivation, initiative and genuine enthusiasm" for the position in his interview than Aka had in his. J.A. at 222.

Aka seeks to discredit these proffered nondiscriminatory reasons for choosing Valenzuela with several items of evidence. First, Aka cites Valenzuela's application for the Central Pharmacy Technician position as evi-

dence that Valenzuela had extremely little relevant experience, and no relevant education. Valenzuela's application indicates that, before getting the Central Pharmacy Technician job, he worked at Washington Hospital for less than a year in the position of "Process Finish Operator." J.A. at 225. According to Valenzuela's own description, his "main duty" as a Process Finish Operator was to "prepare clean linen for delivery," although "when needed" he would "work in the folding machines and ironer." Id. at 226. The reference to his prior pharmacy work appears at the bottom of Valenzuela's application, where he stated that he had spent two months volunteering at a pharmacy "pricing, stocking, ... filling up cassettes [and] pick[ing] up and deliver[ing] medicine from nursing units." Valenzuela had no college degree. Id. at 226. Second, Aka maintains that he had a good deal more relevant experience than Valenzuela, as well as more relevant education. During his twenty years as an orderly for Washington Hospital, Aka had regularly picked up medicine from the pharmacy, stocked medication in the nurses' work area, and prepared orders for medications; he had accumulated extensive knowledge of the pharmacy's forms, he knew how most of the medications were used in the treatment of patients, and he had a Bachelor's Degree and a Master's Degree in Health Service Management. (The hiring official's interview summary report clearly shows that she was aware of Aka's twenty years of experience with "pharmacy functions" and "drug delivery," J.A. at 229, foreclosing any speculation that Aka might for some reason have decided to keep his relevant experience hidden from the hiring official. Cf. partial dissent at 901.) Aka denies that he failed to show enthusiasm in his interview, contends that his having taken the trouble to apply for the position tends to undermine the claim that he was not interested in it, and argues that if his ability

to discredit this proffered nondiscriminatory reason for the hiring decision turns on a contest of credibility between himself and the person who conducted the interviews, this contest should be left for the factfinder to decide.

As this summary indicates, Aka's evidence[7] was sufficient to discredit Washington Hospital's proffered nondiscriminatory reasons for this hiring decision in the mind of a reasonable factfinder. Valenzuela's "relevant experience" consisted of a mere two months of experiencing roughly the same exposure to pharmacy procedures that Aka had experienced for some twenty years. Against Aka's relevant experience and education in the form of twenty years as an orderly for Washington Hospital, a Bachelor's Degree, and a Master's Degree in Health Service Management, Valenzuela offered only two months of volunteer pharmacy work, a prior job in which he learned some medical terminology, less than a year of pressing and folding linens for Washington Hospital, and a high school degree. Based on all of this evidence, a reasonable factfinder could certainly find that Washington Hospital's first proffered nondiscriminatory reason for hiring Valenzuela over Aka deserved little credit. With regard to Aka's second proffered nondiscriminatory reason for its decision—Valenzuela's alleged greater "enthusiasm" in his interview—Aka is correct to point out that the validity of this proffered reason turns on the comparative credibility of himself and the person who conducted the interviews, and that this credibility determination should be left for the factfinder to make. Furthermore, in employment discrimination cases, the use of such subjective criteria as the relative "enthusiasm" of two applicants must be subjected to particularly close scrutiny. See, e.g., Fischbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180, 1184 (D.C.Cir.1996); Farber v.

---

7. Washington Hospital argues that we should disregard all of Aka's arguments that are based on Aka's affidavit, because this affidavit fails to satisfy the requirement under Federal Rule of Civil Procedure 56(e) that affidavits be made "on personal knowledge," FED.R.CIV.P. 56(e), and because much of the material in the affidavit upon which Aka relies would not be admissible at trial. See Brief of Appellee Washington Hospital

Center at 27–29. In fact, Aka's evidence summarized above is based on a combination of Aka's personal knowledge regarding his own experience and education, and admissible record evidence regarding Valenzuela's experience and education (the latter consisting primarily of information included in Valenzuela's job application).

*Massillon Bd. of Educ.,* 917 F.2d 1391, 1399 (6th Cir.1990); *Lilly v. Harris–Teeter Supermarket,* 842 F.2d 1496, 1506 (4th Cir.1988). Such close scrutiny counsels against any presumption that an employer's reference to subjective criteria constitutes a legitimate, nondiscriminatory reason for the challenged action.

We note that, as the preceding evaluation of Aka's evidence demonstrates, we have certainly not adopted a rule whereby "the plaintiff automatically survives summary judgment by presenting evidence that *questions* the employer's proffered reasons." Partial dissent at 898 (emphasis added). Were that our position, our analysis would comprise no more than a sentence or two, because it is patently obvious that Aka's evidence "questions" Washington Hospital's proffered reasons. Aka has presented evidence that "questions" Washington Hospital's proffered reasons for the four file clerk hiring decisions as well, and yet we affirm the grant of summary judgment to Washington Hospital with regard to those decisions. *See infra* Part II.B. Rather, as we are required to do under controlling precedent laid down by the Supreme Court and this court in *Hicks, Barbour,* and *Kolstad,* we have scrutinized Aka's evidence with a view to determining whether it is sufficient to *discredit* Washington Hospital's proffered reasons *in the mind of a reasonable factfinder. See supra.* Aka's evidence is clearly sufficient to do that and more. Pursuant to the same *caveat* that we expressed in *Barbour* and *Kolstad* regarding "speculation" about the reasoning the jury might apply in discrimination cases, *see supra,* we note that the hiring official's focus on Aka's alleged lack of "enthusiasm," when added to Aka's documented qualifications, education, and experience and Washington Hospital's failure to come forward with any credible nondiscriminatory reasons for not hiring him, could well support the finding that Washington Hospital was motivated by discriminatory animus—after all, outward indicia of "enthusiasm" are just the sort of traits that advancing age and heart-related disability tend to diminish.

We also note that our colleague not only reaches a contrary conclusion with regard to Aka's evidence, she evaluates this evidence under a radically different standard from ours—one that we think constitutes spectacular overreaching. Simply stated, our colleague proclaims *herself* the factfinder, and decides all of the issues of material fact relevant to the Central Pharmacy Technician hiring decision based on her *own* weighing of the conflicting evidence—without regard to what another reasonable factfinder might conclude from this evidence. *See* partial dissent at 900–02. First, our colleague announces that in her view, Aka's superior education was "irrelevant" to, and hence "does not cast doubt" on, Washington Hospital's proffered reasons for hiring Valenzuela, because, in her view, Aka's education *overqualified* him for the position. *Id.* at 900–01. Next, she acknowledges that record evidence supports the conclusion that the Washington Hospital official who chose Valenzuela over Aka for this position did so with the knowledge that Aka had twenty years of experience at Washington Hospital with "pharmacy functions" and "drug delivery," *see id.* at 901, but she chooses to credit the hiring official's explanation for having chosen Valenzuela despite Aka's greater experience. *See id.* Then she chooses to credit as well the hiring official's testimony that Valenzuela was "enthusiastic" when he interviewed for the position. *See id.* Finally, having decided all of the issues of material fact against Aka by considering and rejecting Aka's evidence, our colleague proclaims that, because *she* found them credible, Washington Hospital's proffered reasons were "unrebutted." *Id.* at 902. We are disturbed by our colleague's temporary transmogrification into a factfinder, not because her factual findings are unreasonable, but because "at the summary judgment stage the judge's function is not h[er]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. Furthermore, the fundamentals of summary judgment require us, when reviewing a grant of summary judgment to the *defendant,* to view the evidence in the light most favorable to the *plaintiff.* Using our colleague's most egre-

gious violation of these principles as an example, we think it possible that a reasonable factfinder could conclude that Aka's Master's Degree in Public Health tended to make him better qualified than Valenzuela for the Central Pharmacy Technician position, rather than that this degree was "irrelevant" to the hiring decision because it *overqualified* him for that position.[8] *See* partial dissent at 900–01. It is unclear whether the partial dissent's aggressive invasion of the province of the factfinder is a cousin to its attack on the *Hicks* standard, *see supra,* but we think these two portions of the partial dissent are related at some level, because they both reflect a willingness to throw off the restraints that controlling law has placed upon this court's powers.

■ Because Aka presented sufficient evidence[9] to discredit Washington Hospital's proffered reasons for passing him over for the job of Central Pharmacy Technician in the mind of a reasonable factfinder, we reverse the district court's grant of summary judgment to Washington Hospital on Aka's claim that this hiring decision violated his rights under Title VII, the ADEA, and the ADA, and remand these claims for trial on the merits.

B. *The Four File Clerk Hiring Decisions*

Aka also claims that he presented sufficient evidence to survive summary judgment with regard to his claims that Washington Hospital's failure to hire him for one of the four File Clerk positions that opened up in July of 1993 violated his rights under Title VII, the ADEA, and the ADA. Including the two who were later removed because they were not employees (and thus their selection had violated the collective bargaining agreement), Washington Hospital chose six applicants over Aka for these positions. Again, because Washington Hospital does not now claim that Aka failed to present a *prima facie* case with regard to these claims, *see supra,* we turn to the latter two parts of the *McDonnell Douglas* framework to ascertain whether summary judgment was appropriate.

Washington Hospital proffered two nondiscriminatory reasons for choosing the six successful applicants over Aka. First, Washington Hospital argued that these applicants had current experience with filing systems and office and clerical routines, while Aka had no relevant clerical or office experience. The six successful applicants included one who had worked as a retail salesperson and as a mailroom clerk and had attended a school of business; one who had worked for Washington Hospital as a File Clerk in the Patient Financial Services Department; one who had worked as Senior Data Entry Clerk for George Washington University, as a Senior Collections Representative, as a Patient Representative for Washington Hospital, and for six months as a File Clerk in Washington Hospital's Patient Financial Services Department; one who had done clerical work for Sterling Optical and the Hecht Company and

8. Although we have assumed, for the sake of argument, that our colleague's resolutions of the issues of material fact relating to the Central Pharmacy Technician position were "reasonable," *see supra,* we note that our colleague's assertion that Aka's Master's Degree in Public Health was both "irrelevant" to this position *and* rendered him "overqualified" for that position is unsound. If a qualification is "irrelevant" to a position, then it obviously cannot make one "overqualified" for that position, and *vice-versa*.

9. Washington Hospital seeks to bolster its case by pointing to a portion of its deposition of Aka, wherein Aka failed to respond to a question with information sufficient to prove that his national origin, age, or disability had motivated Washington Hospital's challenged hiring decisions. *See* Brief of Appellee Washington Hospital Center at 34–35. The district court also cites these portions of the deposition for the proposition that

"Aka's own testimony makes clear that the only basis he has for hauling the defendant into Federal Court to defend this charge is that he did not get a job." *Aka,* 1996 WL 435026 at *5. We disagree that Aka's claims should not survive a summary judgment motion because he was unable to summarize all of his evidence in response to a question posed by the defendant during a deposition. The factfinder will have much more than the complainant's answer to a question posed in a deposition from which to infer that the challenged employment action reflected intentional discrimination. Furthermore, the purpose of the *McDonnell Douglas* framework is to permit victims of discrimination to secure relief even when they *don't* have access to direct evidence of the employer's discriminatory animus. *See Burdine,* 450 U.S. at 255–56, 101 S.Ct. at 1094–95.

had worked for Washington Hospital for six months as a File Clerk in the Patient Financial Services Department; one who had done clerical work at a doctor's office, the United States Postal Service, and a law firm; and one who had worked as a file clerk for a collection agency. Second, Washington Hospital asserted that, unlike Aka, the six successful applicants had significant "track record[s] in dealing with customers." J.A. at 233.

▮ Aka attempts to discredit the first reason by pointing out that, in his position as an orderly, he had been responsible for "properly maintaining health care providers' records at [Washington Hospital]," and that his education underlying his Bachelor's and Master's Degrees had taught him "how to deal with numbers and files carefully." Brief of Appellant Etim U. Aka at 27. With regard to the second reason, Aka argues that he had as extensive a "track record" as the other applicants, because he had "deal[t] with the hospital's customers" (i.e., its patients) as an orderly. Id. at 28.

Aka's evidence could not discredit Washington Hospital's proffered nondiscriminatory reasons for these hiring decisions in the mind of a reasonable factfinder. All of the six successful applicants offered clerical and office experience more directly relevant to the File Clerk positions than any experience Aka could offer, and several of them had actually filled File Clerk positions for several months already, as temporary employees. Additionally, Aka's "track record" was not as directly pertinent to the File Clerk positions as those of the successful applicants; while Aka "dealt with" Washington Hospital's customers, he did so as an orderly, rather than in the office or clerical context. Therefore, we affirm the district court's grant of summary judgment to Washington Hospital on these claims.

C. *The Remaining Challenged Hiring Decisions*

Aka also maintains that he offered sufficient evidence to survive summary judgment in regard to several other positions for which he applied and was rejected, after having been turned down for the positions discussed above. However, Washington Hospital correctly points out that Aka failed to identify any of these positions in his complaint, or to establish even a *prima facie* case in regard to these positions, and therefore we affirm the district court's grant of summary judgment to Washington Hospital with regard to these claims. We note, however, that although Aka cannot present these hiring decisions as separate grounds for relief, he may nevertheless introduce evidence regarding these later job applications in pressing those claims that survive Washington Hospital's summary judgment motion. *See United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977) ("A discriminatory act which is not made the basis for a timely charge ... may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue....").

D. *Washington Hospital's Failure to Reassign Aka to Make a "Reasonable Accommodation" to Aka's Disability*

Aka also alleges that the district court erred in denying his motion for summary judgment as to his claim that Washington Hospital had violated the ADA by failing to reassign him to a vacant non-strenuous position after his disability made him unable to continue working as an orderly.

The ADA provides that:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees....

42 U.S.C. § 12112(a). The statute then defines "discrimination" to include

not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

*Id.* at § 12112(b)(5)(A). The statute's general definitions section provides that:

The term "reasonable accommodation" may include—

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, *reassignment to a vacant position,* acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Id.* at § 12111(9) (emphasis added). With regard to the "undue hardship" that can excuse an employer from the obligation to make "reasonable accommodations," the definitions section provides:

**(A) In general**

The term "undue hardship" means an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B).

**(B) Factors to be considered**

In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include [the nature and cost of the accommodation needed, the financial resources of the covered entity, the type of operations of the covered entity, and other factors].

*Id.* at § 12111(10).

Before turning to the arguments pressed by the parties in regard to this claim, we address a preliminary issue which the parties did not address directly in their briefs. Under the EEOC regulations implementing the ADA, an employer should not offer to reassign a disabled employee to a vacant position as a "reasonable accommodation" to the employee's disability until it has first established that no form of accommodation capable of being offered without creating "undue hardship" could enable the disabled employee to return to the position he or she held before becoming disabled. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(*o*) ("In general, reassignment should be considered only when accommodation within the individual's current position would pose an undue hardship."). Aka

does not argue that the appropriate "reasonable accommodation" under the ADA would be an "in-position" accommodation, for example some modification of the work environment or circumstances in which the functions of an orderly are performed that would enable him to return to this position. Instead, Aka appears to concede that no accommodation capable of being instituted without "undue hardship" could enable him to perform all of the "essential functions" of the orderly position, which include lifting heavy patients. *See* J.A. at 115 ("Q[uestion:] With the restrictions that you were given, specifically no heavy lifting or pushing, were you able to perform the job of orderly? A[nswer:] No."); *cf.* 42 U.S.C. § 12111(8) (defining "qualified individual with a disability" with regard to a particular position as one who, with accommodations if necessary, can perform the "essential functions" of the position). It also appears that Washington Hospital, which bears the burden of making a "reasonable effort" to determine which accommodation would be most appropriate once a disabled employee has requested an accommodation, 29 C.F.R. Pt. 1630, App. § 1630.9, has already concurred with Aka's premise that the most appropriate accommodation to his disability is reassignment to a vacant, nonstrenuous position. Washington Hospital seemed to manifest its agreement with this conclusion by suggesting to Aka that he apply for such positions. Thus, we think the record provides an acceptable explanation for the fact that the parties have focused on the particular accommodation of reassignment to a vacant position, rather than the generally preferred option of some form of "in-position" accommodation. However, we do not mean to suggest that Washington Hospital has waived the opportunity to look into the possibility that some "in-position" accommodation would be more appropriate to Aka's disability than reassignment to a vacant position; rather, we leave Washington Hospital the option of arguing, on remand, that some form of "in-position" accommodation, which would enable Aka to return to his job as an orderly, would be more appropriate than reassignment to a vacant position. If we are correct in our conclusion that Washington Hospital has already concluded that Aka can-

not return to the orderly position without "undue hardship" resulting, then on remand Washington Hospital must demonstrate why the accommodation Aka has specifically requested, reassignment to a vacant non-strenuous position, is "unreasonable" or could not be imposed without "undue hardship."

Washington Hospital successfully argued before the district court, and now argues before this court, that it was not required to transfer Aka to a vacant non-strenuous position after his disability made it impossible for him to return to his orderly position, because to do so would have violated two provisions of the collective bargaining agreement. Paragraph 14.19 of the collective bargaining agreement requires Washington Hospital to post bargaining unit job openings in two specified locations for at least five days before filling the openings, and Paragraph 8.1(b) sets out the general procedures for selecting among applicants for posted positions; this paragraph includes a requirement that Washington Hospital give employees with greater seniority a preference over less-senior employee applicants who are equal in ability. The district court relied exclusively on Washington Hospital's argument that the "reasonable accommodation" of reassignment to a vacant non-strenuous position would have violated the collective bargaining agreement, in dismissing Aka's "reasonable accommodation" claim. *See Aka,* 1996 WL 435026 at *5–*6.

Aka now presents several arguments in support of his claim that the district court erred in granting summary judgment to Washington Hospital on his "reasonable accommodation" claim. First, he argues that granting him the "reasonable accommodation" he seeks would not conflict with the collective bargaining agreement, because the agreement contains a provision authorizing just such reassignments. Paragraph 14.5 of the collective bargaining agreement ("the handicapped-transfer provision") provides that:

An employee who becomes handicapped and thereby unable to perform his job shall be reassigned to another job he is able to perform whenever, in the sole discretion of the Hospital, such reassignment

is feasible and will not interfere with patient care or the orderly operation of the Hospital.

J.A. at 207. Thus, the relevant collective bargaining agreement *itself* requires the transfer of handicapped employees under certain conditions. Washington Hospital's first response to Aka's reliance on Paragraph 14.5 is that this provision creates no exception to the posting and selection procedures set out in Paragraphs 14.19 and 8.1(b), and thus every vacancy must be filled pursuant to the latter two paragraphs regardless of the handicapped-transfer provision. We reject this interpretation. Although the handicapped-transfer provision and the provisions setting out the general posting and selection procedures do not attempt to accommodate each other, under the most reasonable reading of the agreement as a whole, the provision authorizing the transfer of handicapped employees to vacant positions creates an exception to the otherwise-applicable posting and selection procedures. A contrary interpretation, whereby the posting and selection procedures would preempt the handicapped-transfer provision, would render the handicapped-transfer provision completely ineffective: If vacancies must be posted and filled in the same fashion regardless of whether an employee has become eligible for a handicapped-transfer, no handicapped employee would *ever* be entitled to reassignment. All of the pertinent principles of interpretation are contrary to this latter understanding of the collective bargaining agreement, including the principle that courts should assume that the parties intended for every part of an agreement to have meaning, *see* FARNSWORTH ON CONTRACTS § 7.11 (1990), the related principle that courts should give preference to interpretations that do not render any portion of the agreement ineffective or mere surplusage, *see id.,* and the principle requiring that a more specific provision (*e.g.,* the handicapped-transfer provision) be permitted to operate as an exception to more general provisions (*e.g.,* the job-posting and seniority-preference provisions) in cases of clear conflict. *See id; see also Conoco, Inc. v. NLRB,* 91 F.3d 1523, 1526 (D.C.Cir.1996) (preferring an interpretation of a provision in a collective

bargaining agreement which "imbue[d] the provision with meaningful content").

We are not convinced by any of Washington Hospital's efforts to press an interpretation contrary to the clear meaning of Paragraph 14.5. Washington Hospital argues that the fact that it has never reassigned handicapped employees to vacant positions without following the job-posting provision shows that transferring Aka to a vacant position would violate the agreement. The record does not indicate why Washington Hospital has never given this provision effect in the past, but the hospital does not dispute that the provision remains a part of the agreement, and we do not agree that the provision should be treated as having atrophied and become void from disuse. Washington Hospital also makes the remarkable assertion that the provision does not permit reassignment of Aka because the Acting Director of its Office of Personnel Relations believes that *any* reassignment "would be unfeasible and would interfere with patient care or the orderly operation of Washington Hospital Center." J.A. at 423. But if we were to interpret this provision as permitting Washington Hospital unilaterally to decide that it will always use the discretion granted in this Paragraph to deny transfers, we would be permitting one party to the agreement unilaterally to render a provision of the agreement ineffective. We decline to give Washington Hospital this power, not only because it would make the collective bargaining process a sham, but also because it violates the clear language of the handicapped-transfer provision, which requires an exercise of discretion in *each individual case* in which an employee becomes handicapped. Finally, Washington Hospital argues that the Arbitrator's decision rejecting Aka's and the union's grievances regarding the File Clerk hiring decisions was contrary to Aka's "reasonable accommodation" claim, and that we should defer to this decision. But the Arbitrator never even referred to the ADA, the collective bargaining agreement's handi-

capped-transfer provision, or "reasonable accommodation" in his opinion. *See* J.A. at 281–91. Thus, we reject Washington Hospital's argument that transferring Aka to a vacant position under Paragraph 14.5 would under no circumstances be consistent with the collective bargaining agreement.

The bulk of Washington Hospital's argument, however, is not devoted to showing that the collective bargaining agreement prohibits any transfer of a handicapped employee to a vacant position except pursuant to the general posting and selection procedures, but rather to the proposition that employers cannot be mandated to provide accommodations when doing so would conflict with the terms of a collective bargaining agreement. Washington Hospital cites several Rehabilitation Act cases for the proposition that the reassignment of handicapped employees was virtually never required under that Act, *see* Brief of Appellee Washington Hospital Center at 41–42 (citing *Mason v. Frank,* 32 F.3d 315, 319–20 (8th Cir.1994); *Shea v. Tisch,* 870 F.2d 786, 789–90 (1st Cir.1989); *Jasany v. United States Postal Serv.,* 755 F.2d 1244, 1251–52 (6th Cir.1985); and *Daubert v. United States Postal Serv.,* 733 F.2d 1367, 1370 (10th Cir.1984)), as well as a few ADA cases in which circuit courts declined to require employers to provide accommodations that would conflict with the terms of applicable collective bargaining agreements. *See id.* at 43 (citing *Eckles v. Consolidated Rail Corp.,* 94 F.3d 1041, 1051 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 1318, 137 L.Ed.2d 480 (1997); *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1125 (10th Cir.1995)).[10] With regard to the cases construing the Rehabilitation Act, we note that although this Act is quite similar to the ADA in most respects, *see supra,* the two acts diverge sharply on this particular question, because the ADA explicitly suggests "reassignment to a vacant position" as a form of "reasonable accommodation" that may be required of employers. 42 U.S.C. § 12111(9). The ADA cases, however, are pertinent to Aka's claim because

---

**10.** Washington Hospital also cites *Carter v. Tisch,* 822 F.2d 465, 469 (4th Cir.1987), for the proposition that a duty to accommodate a disabled employee under the ADA cannot defeat the provisions of a collective bargaining agreement. *See*

Brief of Appellee Washington Hospital Center at 43. But that case is clearly inapposite, since it was decided three years before the passage of the ADA.

even though Paragraph 14.5 provides a mechanism for producing the outcome (reassignment to a vacant position) that Aka seeks as an accommodation to his disability, there is still a difference between Washington Hospital reassigning a disabled employee pursuant to the ADA's mandate and Washington Hospital reassigning the employee pursuant to the procedures specified in the agreement. The ADA requires reassignment when it is the most appropriate "reasonable accommodation" available, and would not impose "undue hardship" on the employer; the collective bargaining agreement requires reassignment whenever, in Washington Hospital's discretion, it is "feasible" and "w[ould] not interfere with patient care or the orderly operation of the hospital." It's not clear whether adding the ADA "reasonable accommodation" obligation expands the set of situations in which reassignment is required beyond those defined in the collective bargaining agreement, or whether in each case in which the ADA would require reassignment the agreement would as well, but clearly there is a conflict, however minimal, between the agreement and the ADA.[11] This conflict arises from the fact that a particular reassignment might be required by the ADA but not fall within the agreement's handicapped-transfer provision, for in such a case the ADA would clash with the seniority system instituted in Paragraph 8.1(b) of the agreement.

Congress hoped that post-ADA collective bargaining agreements would include provisions enabling employers to offer accommodations to disabled employees without creating *any* conflict with the agreements—provisions along the lines of: "The employer may take all actions necessary to comply with the Americans with Disabilities Act." *See* H.R. REP. No.101–485, pt. 2, at 63

(1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 303, 346; *accord* S. REP. No. 101–116, at 32 (1989). Such a provision would create an exception to all of the other components of the agreement that would by definition have the exact dimensions necessary to permit "reasonable accommodations" to pass through. Where, as here, the applicable agreement contains no such provision, there generally will be *some* conflict between the agreements and the provision of certain accommodations; sometimes a disabled employee may seek to pass the square peg of an accommodation through the round hole of a provision in the agreement authorizing the requested accommodation pursuant to certain procedures, and in other cases the agreement may include no provision permitting anything similar to the requested accommodation. This case falls in the former category, and thus we must decide what significance to accord the fact that the ADA's obligation to make "reasonable accommodations" here conflicts with the terms of a collective bargaining agreement.

■■■ We hold that the district court erred in resting its dismissal of Aka's "reasonable accommodation" claim on the conclusion that any conflict between a requested accommodation and a collective bargaining agreement bars the disabled employee from claiming an entitlement to the accommodation under the ADA. *See Aka,* 1996 WL 435026, at *6. Instead, the fact that a requested accommodation does not fall squarely within the terms of the applicable collective bargaining agreement is relevant only insofar as it undermines the employee's claim that the requested accommodation is "reasonable," or bolsters the employer's affirmative defense that the accommodation could not be provided without "undue hardship."[12] The statute, its legislative history,

---

11. In order to avoid any confusion, we stress that our colleague's mystifying assertion that we find *no* conflict between the agreement and the ADA is, quite simply, wrong. *See* partial dissent at 903. For this reason, our colleague's characterization of our discussion of conflicts between collective bargaining agreements and the ADA as a "dictum," *id.* at 903, is equally wrong. The term *dictum* refers to "[a]n expression in an opinion which is not necessary to support the decision reached by the court." BALLENTINE'S LAW

DICTIONARY 346 (3d ed.1969). Because we find that just such a conflict exists in the case at bar, our discussion of conflicts between ADA "reasonable accommodations" and collective bargaining agreements, *see infra,* is necessary to our decision.

12. Under this circuit's precedent in *Barth,* the disabled employee bears the burden of persuasion on the question of whether the requested accommodation is "reasonable." *See Barth,* 2

and the EEOC regulations implementing it indicate that the inquiry into whether a particular accommodation may be required by the ADA must be made in light of the specific nature of the requested accommodation and of the employer's business, including (but not limited to) the degree to which the accommodation might disrupt the workforce by upsetting settled expectations created by the collective bargaining agreement, or by undermining the operational structure instituted by the agreement. *See* 42 U.S.C. § 12112 (requiring covered entities to make "reasonable accommodations" unless they can demonstrate that to do so would impose "undue hardship"); H.R. REP. No. 101–485, pt. 2, at 63 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 345 (noting that the fact that an accommodation is inconsistent with the terms of a collective bargaining agreement "may be considered as a factor" in determining whether the accommodation is "reasonable" but that it "would not be determinative on the issue"); *accord* S. REP. No. 101–116, at 32 (1989); *see also* 29 C.F.R. Pt. 1630, App. § 1630.15(d) (explaining that the terms of a collective bargaining agreement "may be relevant" to the determination of whether the provision of a particular accommodation would "be unduly disruptive to its other employees or to the functioning of its business").

We acknowledge that our approach to conflicts between a collective bargaining agreement and an accommodation sought under the ADA diverges somewhat from the analysis applied by three of our sister circuits, perhaps most notably from the Seventh Circuit's approach to a factually similar situation in *Eckles*.[13] The *Eckles* court addressed a disabled employee's claim of entitlement to an accommodation that would have contravened the broad seniority-preference provision in the applicable collective bargaining agreement, but that could nevertheless have been provided pursuant to another provision in the agreement that authorized the granting of the requested accommodation pursuant to individual agreements negotiated by representatives of the union and the employer. *See id.* at 1043–44. The *Eckles* court accepted the employer's premise that the terms of a collective bargaining agreement can bar the ADA from mandating an accommodation even without an individualized finding that the accommodation would impose an "undue hardship" or would be "unreasonable." *See id.* at 1045–46. However, the court expressly declined to find that *all* provisions in collective bargaining agreements are "immune from limitation by the ADA duty to reasonably accommodate," stressing that its holding was limited to collectively-bargained seniority rights, which had "a pre-existing special status in the law." *Id.* at 1052.

We reject the *Eckles* court's analysis because the plain language of the ADA re-

F.3d at 1187. Should the employee succeed in demonstrating that a "reasonable accommodation" is available, the employer may claim that the accommodation would impose an "undue hardship" as an affirmative defense to its obligation to provide the accommodation. *See id.*

13. *See Boback v. General Motors Corp.*, 107 F.3d 870 (Table), 1997 WL 3613 (Unpublished Disposition), at **5 (6th Cir. Jan. 3, 1997) ("[T]he ADA does not require an employer to violate the contractual rights of other workers in an effort to accommodate a single employee."); *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1114 (8th Cir.1995) ("The ADA does not require that [the employer] take action inconsistent with the contractual rights of other workers under a collective bargaining agreement."). The *Eckles* court also cited a case from the Tenth Circuit, *see Eckles*, 94 F.3d at 1051 (citing *Milton*, 53 F.3d at 1125), and one from the Fifth Circuit, *see id.* (citing *Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 1263, 134 L.Ed.2d 211 (1996)), as consis-

tent with its holding that "the ADA does not require disabled individuals to be accommodated by sacrificing the collectively bargained, bona fide seniority rights of other employees." *Id.* But these other decisions do not clearly adopt any such *per se* rule. In *Milton*, the Tenth Circuit held that the reassignment requested by a disabled employee was "unreasonable," and supported this conclusion with, among other things, the observation that the reassignment would be contrary to the collectively-bargained seniority system. *Milton*, 53 F.3d at 1125. And in *Daugherty,* the Fifth Circuit observed that an employer is "not required to fundamentally alter its program" or to "find or create a new job" for a disabled employee, *Daugherty*, 56 F.3d at 700 (quoting *Chiari v. City of League City*, 920 F.2d 311, 318 (5th Cir.1991)), under the ADA provision exempting employers from any obligation to provide accommodations that would impose "undue hardship."

quires employers to provide accommodations to the disabilities of qualified employees unless the accommodation in question would be "unreasonable" or would impose an "undue hardship," see 42 U.S.C. § 12112, because the suggested "reasonable accommodations" listed in the statute include several (among them the reassignment to a vacant position that Aka seeks) that commonly will conflict to some degree with the applicable collective bargaining agreements in unionized workplaces—including the portions of those agreements creating "seniority rights," see id. at § 12111(9); see also Eckles, 94 F.3d at 1052; Mary K. O'Melveny, The Americans with Disabilities Act and Collective Bargaining Agreements: Reasonable Accommodations or Irreconcilable Conflicts?, 82 KY. L.J. 219, 234 (1993–94), and because both the legislative history of the ADA and the relevant EEOC regulations clearly indicate that the fact that a particular accommodation would require some departure from the terms of a collective bargaining agreement should not in itself determine the question of whether an employer may be required to provide the accommodation. See supra.[14] Thus, we would misconstrue the ADA's "reasonable accommodation" requirement if we were to allow any and all "conflicts" between requested accommodations and the terms of collective bargaining agreements to stand as per se bars to disabled employees' claims of entitlement to these accommodations under the ADA.

We likewise think it inappropriate to draw blanket conclusions regarding whether the ADA can "trump" provisions in collective bargaining agreements, Eckles, 94 F.3d at 1046 n. 8, 1047, 1048, or whether the ADA can require the "sacrifice[ ]" of "rights" created in other employees by these agreements, id. at 1045—after all, in some cases the degree of infringement imposed by a "reasonable accommodation" to one employee's disability on a "right" held by other employees under the collective bargaining agreement may be extremely slight, and may impose virtually no "hardship" at all. If one nondisabled employee entitled to a vacant position under the seniority system in the collective bargaining agreement must wait an extra day before receiving an identical assignment because the earlier vacancy was filled by a disabled employee pursuant to the ADA, would this entail the "sacrifice" of "rights" created in other employees under the agreement? Would this constitute the "trumping" of the agreement's seniority system by the ADA? We think that the ADA's "reasonable accommodation" provisions require us to bear in mind that conflicts between accommodations to disabled employees and the terms of applicable collective bargaining agreements exist on a continuum, rather than functioning like an "on/off" switch. Cf. id. at 1047 ("What would be lost to other employees [if the disabled employee were given the requested accommodation], particularly more senior employees, would be some of the value of their seniority with the company...."). In the case at bar, for example, the applicable collective bargaining agreement carves out an exception to the "seniority system" authorizing the employer to fill vacancies with reassigned disabled employees (rather than posting notices of the vacancies, taking applications, and exercising the normal seniority preference) whenever the employer's discretion indicates that doing so would be "feasible" and "w[ould] not interfere with patient care or the orderly opera-

14. Thus, the nature of the ADA prevents the Supreme Court's Title VII decision in TWA v. Hardison, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977) from being directly applicable to this case. Cf. Eckles, 94 F.3d at 1048 (discussing Hardison). Although in Hardison the Court held that the duty to provide "reasonable accommodations" imposed under an EEOC regulation implementing Title VII did not require an employer "to take steps inconsistent with the otherwise valid [collective bargaining agreement]" Hardison, 432 U.S. at 79, 97 S.Ct. at 2274, it was careful to note that it reached this conclusion in the absence of any "clear and express indication from Congress" explaining how courts should address such inconsistencies. Id. The ADA and its legislative history include the "clear and express indications" that Title VII lacked, including the enumeration of "reassignment to a vacant position" in the statutory provision regarding "reasonable accommodations," and the statements in reports from both houses of Congress stressing that conflicts between requested accommodations and provisions of collective bargaining agreements (including seniority systems) are not "determinative" in the inquiry into whether the employer must provide the accommodations. See supra.

tion of the hospital." This built-in exception to the seniority system is quite broad in scope, and appears to be quite similar to the ADA in determining when reassignment may be required. Thus, although there is a conflict between the agreement and the "reasonable accommodation" Aka seeks, the conflict is relatively minor, and therefore it appears to present little difficulty for Aka's claim that the accommodation is "reasonable"; by the same token, the conflict appears to give Washington Hospital little purchase for any affirmative defense that the reassignment would impose an "undue hardship." *Cf. Buckingham v. United States,* 998 F.2d 735, 741–42 (9th Cir.1993) (holding that a job transfer provided as a "reasonable accommodation" under the Rehabilitation Act did not conflict with a collective bargaining agreement when the agreement included a provision authorizing transfers and requiring a seniority preference in transfers "[e]xcept in the most unusual of circumstances"). To put it in terms of the infringement on the "seniority rights" of other employees, the other employees' seniority rights were already limited by the handicapped-transfer provision, which prevented them from bidding for (and asserting their seniority preference in regard to) vacancies required to be given to reassigned handicapped employees under Paragraph 14.5; with the prospect of reassignments occurring also under the ADA, this limit on the other employees' seniority rights may extend to at most a few more reassignments, and may remain unchanged.

The record indicates, therefore, that a triable issue of fact exists as to whether Washington Hospital has satisfied its obligation to offer Aka the "reasonable accommodation" to his disability required under the ADA. Aka has demonstrated that one form of "reasonable accommodation" specifically enumerated in the ADA is available, by showing that he is a "qualified individual with a disability" with regard to nonstrenuous positions such as File Clerk and Central Pharmacy Technician, 42 U.S.C. § 12112(a), and the record indicates that Washington Hospital has not even considered reassigning him to such a position, *see id.* at §§ 12112(b)(5)(A), 12111(9), nor has it offered Aka any other "reasonable accommodation," as it is required to do by the ADA. Because the district court dismissed this claim on what it improperly considered a threshold issue—the conflict between the ADA obligation to make "reasonable accommodations" and the seniority system instituted in the collective bargaining agreement—the parties have not yet properly framed and argued the questions of whether the accommodation Aka seeks is "reasonable" and whether the accommodation would impose an "undue hardship" on Washington Hospital, and therefore we deny Aka's motion for summary judgment in his favor on this claim, and we remand the claim for trial on the merits.

## III. CONCLUSION

Aka presented sufficient evidence to discredit Washington Hospital's proffered nondiscriminatory reasons for choosing Jaime Valenzuela over him for the position of Central Pharmacy Technician in the mind of a reasonable factfinder, and presented sufficient evidence to create genuine issues of material fact as to whether Washington Hospital was required under the ADA to reassign him to a vacant nonstrenuous position as a "reasonable accommodation" of his disability, but summary judgment for Aka on this claim is inappropriate because Aka has not shown that a reasonable factfinder must resolve these issues in his favor; in all other respects, the district court's grant of summary judgment to Washington Hospital was appropriate. Accordingly, we reverse the district court's grant of summary judgment to Washington Hospital as it affects Aka's claims related to the Central Pharmacy Technician position and his "reasonable accommodation" claim, we deny Aka's request for summary judgment on the latter claim, and we remand the case for trial on the merits of the remanded claims.

*So ordered.*

KAREN LeCRAFT HENDERSON, Circuit Judge, concurring in part and dissenting in part:

We all agree that Washington Hospital Center (Washington Hospital) is entitled to summary judgment on Aka's claims regarding the file clerk positions and, accordingly, I

concur in our affirmance on those claims. I strongly disagree, however, with the majority's conclusion that Aka produced sufficient evidence to survive summary judgment with respect to the central pharmacy technician position. I believe remand for a trial on the question whether Washington Hospital rejected Aka for *any* of the available positions in violation of Title VII, the ADA or the ADEA is wrong and, accordingly, I dissent from the reversal of the grant of summary judgment on those claims. With respect to Aka's reasonable accommodation claim, I agree with the majority that a remand is necessary. I write separately on this issue, however, because the majority reaches issues we need not reach.

## I.

The majority takes a spectacular wrong turn in its opinion. While purporting to rely on the United States Supreme Court's decision in *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), the majority in fact takes an approach to the availability of summary judgment in discrimination cases not only in conflict with both the language and the spirit of that decision but also with circuit precedent, which itself had initially seemed to veer from *Hicks* in *Barbour v. Merrill,* 48 F.3d 1270, 1281 (D.C.Cir.1995), *cert. granted in part,* —— U.S. ——, 116 S.Ct. 805, 133 L.Ed.2d 752 (1996), *cert. dismissed,* —— U.S. ——, 116 S.Ct. 1037, 134 L.Ed.2d 113 (1996) (voluntary settlement by parties).

My disagreement with the majority on Aka's claims regarding the central pharmacy technician position centers on the following question: Once a defendant has proffered legitimate non-discriminatory reasons under the second step of the *McDonnell Douglas* framework, what evidence must a plaintiff produce to survive summary judgment? The majority takes the position that the plaintiff automatically survives summary judgment by presenting evidence that questions the employer's proffered reasons. Maj. Op. at 889 ("Because Aka presented sufficient evidence to discredit Washington Hospital's proffered reasons for passing him over for the job of Central Pharmacy Technician ..., we re-

verse the district court's grant of summary judgment ....") (footnote omitted). Its position, however, is inconsistent with the Supreme Court's decision in *St. Mary's Honor Center v. Hicks*:

> We have no authority to impose liability upon the employer for alleged discriminatory employment practices unless an appropriate factfinder determines, according to proper procedures, *that the employer has unlawfully discriminated.* We may, according to traditional practice, establish certain modes and orders of proof.... But nothing in law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable.

509 U.S. at 514–15, 113 S.Ct. at 2751 (emphasis in original). Thus under *Hicks* the question we ask is not whether a reasonable factfinder could disbelieve Washington Hospital's proffered reasons but whether a reasonable factfinder could believe that Washington Hospital's real reasons were discriminatory. Although the rejection of proffered reasons is *relevant,* it is not *necessarily* determinative of the ultimate and, in the words of the Supreme Court, "much different" finding of discrimination.

Consider the case in which an employer's proffered nondiscriminatory reason is a written evaluation stating that the plaintiff lacked sufficient qualifications for a job. The plaintiff might discredit the evidence with his own evidence that the employer lied on the evaluation. Or the plaintiff might discredit the employer's reason by offering evidence that he did possess the necessary qualifications. The first method is, according to the Supreme Court, more probative of discrimination than the second. *See Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749 (suggesting factfinder could more readily infer discrimination from disbelief of proffered reasons where disbelief is accompanied by suspicion of mendacity). Moreover, there may be evidence that bears on discrimination besides the defendant's stated reasons and the plaintiff's

attack on their authenticity. For example, an outstanding track record in employment relations with members of the protected class or the fact that the challenged employment decision was made by a member of the protected class may weigh against a finding of discrimination—even if the employer's proffered reasons are discredited. *See id.* at 513–14, 113 S.Ct. at 2750–51.

All of this manifests that the connection between pretext and discrimination is intensely fact bound.[1] Our task on summary judgment is to determine whether a reasonable factfinder could find discrimination given the plaintiff's attack on the employer's stated reasons and in light of any other facts in the record relevant to discrimination (such as employer mendacity, which would be indicative of discrimination, or a nondiscriminatory employment track record, which would not). One searches the majority opinion in vain, however, for any analysis of the connection between Aka's attack on Washington Hospital's proffered reasons and his evidence of "unlawful discrimination." To the contrary, the majority concludes Aka survives summary judgment simply because Aka's evidence, if believed, casts doubt on Washington Hospital's proffered reasons. Maj. Op. at 886–88. The majority cannot, however, through its proof scheme authorize the plaintiff to bypass proving an essential element of his claim in violation of the Federal Rules of Civil Procedure, specifically Rule 56, as interpreted by the Supreme Court in an unbroken line of cases. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

The statement in *Hicks,* relied upon by the majority, that "[t]he factfinder's disbelief of the reasons put forward by the defendant ... may, together with the elements of the prima facie case, suffice to show intentional discrimination," 509 U.S. at 511, 113 S.Ct. at 2749, supports the majority's approach *only* if we read it to mean that the factfinder may *in every case* find discrimination on the basis of a *prima facie* case and evidence of pretext. But such a reading is at odds with the plain meaning of *Hicks,* which is that there is a difference between pretext and discrimination. I read the *Hicks* statement upon which the majority relies to mean that in some *but not all* cases the *prima facie* case plus pretext suffices to make a triable issue of discrimination and therefore precludes summary judgment for the defendant. Furthermore, this is the reading I thought our court had settled on in *Barbour v. Merrill,* 48 F.3d at 1281 ("in some cases the combination will be adequate to sustain a finding of discrimination, in others not") (statement of Williams, J., concurring in denial of rehearing *en banc*). *See also Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 994 (5th Cir.1996) (*en banc*) ("[I]f the evidence put forth by the plaintiff to establish the prima facie case and to rebut the employer's reasons is not substantial, a jury cannot reasonably infer discriminatory intent.")[2]; *LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 843 (1st Cir. 1993), *cert. denied,* 511 U.S. 1018, 114 S.Ct.

---

1. This is not to say that my disagreement with the majority is first and foremost one of fact. Although I differ with the majority on the relevance of certain facts, *see infra* at 900–01, that difference lies on the periphery of this dissent. At the core, I dissent because the majority, in failing to recognize the difference between pretext and discrimination, adopts an erroneous rule of law whereby a plaintiff automatically survives summary judgment on the question of discrimination by presenting evidence on the different question of pretext.

2. The majority incorrectly states that the Fifth Circuit's interpretation of *Hicks* in *Rhodes* is dic-

ta. Maj. Op. at 883. In *Rhodes* the Fifth Circuit reviewed the district court's rejection of the defendant's post-verdict motion for judgment as a matter of law in an ADEA case. The court first announced the applicable legal standard—that the plaintiff cannot survive the motion *merely* by discrediting the defendant's proffered reasons but must also produce sufficient evidence to create a jury question on the issue of discrimination. *See* 75 F.3d at 994–995. The court then applied that legal standard in affirming the district court. *See id.* at 996 (concluding plaintiff's evidence entitled jury to find *both* pretext and discrimination).

1398, 128 L.Ed.2d 72 (1994)[3]; Deborah C. Malamud, *The Last Minuet: Disparate Treatment After* Hicks, 93 Mich. L.Rev. 2229, 2307–11 (1995) (where plaintiff makes *prima facie* case and shows pretext, defendant will be entitled to summary judgment in some cases, plaintiff will be entitled to summary judgment in some and triable issues of fact will arise in others).

In *Barbour,* 48 F.3d at 1277, and in *Kolstad v. American Dental Ass'n,* 108 F.3d 1431, 1437 (D.C.Cir.), *reh'g in part granted on other grounds,* (May 28, 1997) (Nos. 96–7030,96–7047), the court did what the majority fails to do here—adequately explain why a reasonable factfinder could infer discrimination on the basis of the *prima facie* case and pretext even if the evidence was "thin to the point of virtual invisibility." *Barbour,* 48 F.3d at 1281 (statement of Williams, J., concurring in denial of rehearing *en banc*). Our statement in *Barbour,* reviewing a post-verdict motion for judgment as a matter of law, that the court "need not speculate about the jury's reasoning," 48 F.3d at 1277, which we repeated in *Kolstad,* 108 F.3d at 1437, requires, I believe, explanation. Of course the court does not speculate in the sense of determining how a particular jury reached its conclusion on discrimination. But the court must "speculate" to the extent that it always does when ruling on summary judgment or judgment as a matter of law. That is, we must ask whether a reasonable factfinder could, *given the facts of the case,* find for the plaintiff on "the ultimate question: whether plaintiff has proven 'that the defendant intentionally discriminated.'" *Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749 (quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)). The majority, by *totally* ignoring the ultimate question, departs from *Hicks.* It also departs from *Barbour,* in an alarming leap from the case-by-case analysis applied there to an automatic preclusion of summary judgment here.

Here Aka's attempt to discredit Washington Hospital's proffered reasons was not sufficiently probative of discrimination for Aka to survive summary judgment. Washington Hospital claims that it hired Jaime Valenzuela over Aka for the pharmacy position because Valenzuela had more relevant experience and demonstrated greater enthusiasm during his interview. The majority points to three factors to impugn Washington Hospital's reasons: Aka had more education, Aka had more experience in pharmacy services and Aka also exhibited enthusiasm during his interview.

The majority's discussion of Aka's and Valenzuela's comparative education is irrelevant on this record. While it is undisputed that Aka had a master's degree and Valenzuela had only a high school degree, Aka's advanced education was not a factor that bolstered his application for the position they both sought. In its "Position Specification" forms Washington Hospital lists educational prerequisites in the section entitled "Qualifications." For example, the Qualifications section for the position of orderly states that the applicant must have a high school diploma or the equivalent. JA 324. By contrast,

---

**3.** The majority claims that *LeBlanc* provides "no support" for my position. Maj. Op. at 883 n.6. To the contrary, *LeBlanc* (an ADEA case) takes precisely the position I maintain here, declaring:

> In the context of a summary judgment proceeding, *Hicks* requires that, once the employer has advanced a legitimate, nondiscriminatory basis for its adverse employment decision, the plaintiff, before becoming entitled to bring the case before the trier of fact, must show evidence sufficient for the factfinder reasonably to conclude that the employer's decision to discharge him or her was wrongfully based on age.

6 F.3d at 843. Thus mere rejection of the employer's proffered reasons, according to *LeBlanc,* is not enough for the plaintiff to survive summary judgment. Nor does the fact that the court in *LeBlanc* considered the discrediting of the employer's reasons as circumstantial evidence of discriminatory animus "conflict[] sharply," Maj. Op. at 883 n.6, with anything that I say. Proof that an employer's proffered reasons are not credible *can be* circumstantial evidence of discrimination. *See Hicks,* 509 U.S. at 517, 113 S.Ct. at 2752 ("proving the employer's reasons false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination"). But discredited reasons do not in every case constitute circumstantial evidence sufficient to survive summary judgment on "the ultimate question of discrimination *vel non.*" *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983).

the official job description for the central pharmacy technician position lists *no* educational prerequisite. JA 332. Thus it appears that an individual could fill the pharmacy position without even completing high school. Plainly, neither a college nor master's degree is required. Indeed, Aka's "interview summary report" completed by Ann Breakenridge, the official responsible for filling the pharmacy position, indicates that Aka's education made him *overqualified* for the job. JA 230 ("Mr. Aka's MBPA degree could be best utilized in other areas of the hospital."). Because Aka's superior education did not—according to undisputed criteria—make him a more desirable candidate for the pharmacy position, it does not cast doubt on Washington Hospital's proffered reasons for hiring Valenzuela.

As to Aka's pharmacy experience, the majority states that during his twenty years as an orderly, "Aka had regularly picked up medicine from the pharmacy, stocked medication in the nurses' work area, and prepared orders for medications[,] ... accumulated extensive knowledge of the pharmacy's forms [and] knew how most of the medications were used in the treatment of patients[.]" Maj. Op. at 887. As discussed *supra,* under *Hicks* we ask whether a reasonable factfinder could find discrimination and not simply whether a reasonable factfinder could disbelieve Washington Hospital's proffered reasons. So the question is not whether Aka *in fact* possessed more relevant experience but whether Washington Hospital's selection of Valenzuela, in light of their relative qualifications, resulted from discrimination. To answer the latter question we assess not the qualifications Aka actually possessed (on summary judgment we assume he had all of the qualifications stated in his affidavit) but what qualifications were known, or should have been known, by Washington Hospital. Aka could even have been a licensed pharmacist but if Washington Hospital were unaware of his credential, its selection of Valenzuela would not suggest discrimination.

Focussing on those qualifications of Aka known to Washington Hospital, we get a different picture from that painted in Aka's affidavit. Aka's application for the pharmacy technician position recites none of the pharmacy experience described in his affidavit. JA 228.[4] By contrast Valenzuela's application indicates that he had actually worked in a pharmacy for two months and had experience in "pricing, stocking, [and] filling up cassettes." JA 226. When asked at oral argument whether Aka revealed his pharmacy experience either on his application or during his interview, Aka's counsel was unable to point to any record evidence that Aka had divulged the information. Instead, Aka's counsel argued that Breakenridge would have known about Aka's experience because, in her position, she would have seen orderlies performing pharmacy tasks. There is, however, nothing in the record to support Aka's claim that Breakenridge would have obtained knowledge of Aka's pharmacy experience listed in his affidavit. The record does include a Position Specification for the orderly position but the only duty related to pharmacy services is the delivery of items, including "medical materials," to and from nursing units. JA 323. This description matches Breakenridge's description of Aka's relevant experience. In Aka's interview summary report she indicates that Aka had experience with the "the drug delivery aspect of the job" but notes that the delivery aspect is "a minor part of the technician responsibilities." JA 229. In short, Aka produced insufficient evidence, if any, on the issue of his pharmacy experience *to raise an inference* that Washington Hospital's conclusion regarding Valenzuela's greater experience resulted from discrimination.

The majority's third factor is Washington Hospital's statement that Valenzuela was a more enthusiastic applicant than Aka. Aka attempts to discredit this reason by claiming that he also demonstrated enthusiasm. On summary judgment we accept Aka's contention that he was enthusiastic during his interview. Even accepting this, however, we

---

**4.** According to the record, Aka's application does not include a portion requesting information on experience. *Cf.* JA 226 (application of Valenzuela). Whether Aka did not fill out that portion of the application or whether he decided not to make it part of the record (here or before the district court) is impossible to tell.

cannot discredit that Valenzuela was an enthusiastic applicant also. Were the factfinder to accept that Aka was enthusiastic, this would not suffice to conclude that Washington Hospital's claim that Valenzuela was *more* enthusiastic masked a discriminatory reason. As the majority points out, subjective criteria such as relative enthusiasm must be viewed with caution. Maj. Op. at 887–88. Otherwise, it would be easy for an employer to conceal discriminatory reasons behind subjective assessments which the plaintiff would have little ability, owing to their subjectivity, to discredit. *Cf. Robbins v. White–Wilson Med. Clinic, Inc.*, 660 F.2d 1064, 1067 (5th Cir.1981) ("potential for discrimination [is] inherent in a subjective selection process involving subjective job criteria"), *vacated on other grounds*, 456 U.S. 969, 102 S.Ct. 2229, 72 L.Ed.2d 842 (1982). That is, an employer with no *non*discriminatory reasons could hide behind an unassailable subjective assessment of an individual. Here, however, the employer has not relied solely on subjective reasons. To the contrary, Washington Hospital offered evidence of Valenzuela's greater work experience and Aka produced nothing to discredit the evidence in a way that would support an inference of discrimination.[5] If an employer supports an employment decision on the basis of an unrebutted objective factor and adds a subjective reason, this should not preclude it from summary judgment. *Cf.* Lex K. Larson, 2 Employment Discrimination § 29.06 (2d ed.1996)

5. By contrast, in the cases cited by the majority to support its conclusion that subjective reasons should be subjected to close scrutiny, the employer's non-subjective reasons *were* rebutted. For example, in *Farber v. Massillon Board of Education*, 917 F.2d 1391, 1399 (6th Cir.1990), the employer's objective reason was that the individual selected for the position "met the minimum established qualifications." The record indicated, however, that the individual did not meet the qualifications. *Id.* Similarly, in *Lilly v. Harris–Teeter Supermarket*, 842 F.2d 1496, 1506 (4th Cir.1988), the employer's objective reason was that the plaintiffs were less qualified. The court rejected this reason as pretextual based on the district court's credibility assessments of the defense witnesses. *Id.* The majority also cites *Fischbach v. District of Columbia Department of Corrections*, 86 F.3d 1180 (D.C.Cir.1996), but that case sheds no light on the issue because there we found that the employer did not rely on a subjective reason at all. *See id.* at 1184

("When the type of job lends itself to objective evaluation but *totally subjective procedures are used*, these facts may well go a long way to support an inference of discriminatory motive.") (emphasis added).

Because Aka failed to adduce any evidence on the essential element of discrimination, I would affirm the district court's grant of summary judgment to Washington Hospital on his Title VII, ADA and ADEA hiring claims.[6] Accordingly, I dissent from the majority's holding on these claims.

**II.**

I agree with the majority that the case should be remanded to the district court on the reasonable accommodation issue of the ADA claim. As the majority states, "In general, reassignment should be considered only when accommodation within the individual's current position would pose an undue hardship." Maj. Op. at 891 (quoting 29 C.F.R. Pt. 1630, App. § 1630.2(*o*)). Because the district court failed to address the possibility of accommodating Aka within his orderly position and because it is impossible to conclude from the record whether such an accommodation would be reasonable or would not result in undue hardship, summary judgment for Washington Hospital was premature. In the event Aka's orderly position cannot be modified such that he can return to it, the district court must resolve the reassignment question.

("[Plaintiff] fails, however, to point to any finding by the district court or to any evidence suggesting that the Department relied upon any highly subjective criterion.").

6. Regarding Aka's ADA and ADEA claims he presented insufficient evidence as a matter of law that his age or disability played any role in Washington Hospital's hiring decisions. As great a distance as exists between Aka's evidence and an inference of discrimination in his ADA and ADEA claims, other factors make the distance even greater in his Title VII claims based on race and national origin. The record manifests Aka's successful twenty-year employment relationship with Washington Hospital. To note the obvious, his race and national origin did not change during that time. To infer that Washington Hospital would begin discriminating on the basis of his race and national origin after twenty years of non-discrimination strains credulity.

In determining whether Aka's reassignment to any vacant position constitutes a reasonable accommodation under the ADA, the majority first concludes there is no conflict between reassignment under the ADA, on the one hand, and the posting procedures (section 14.19) and selection procedures (section 8.1(b)) established in the collective bargaining agreement, on the other, because section 14.5 of the collective bargaining agreement, which specifically provides for reassignment of handicapped workers, "creates an exception to the otherwise-applicable posting and selection procedures." Maj. Op. at 892. That is, in the event the ADA requires reassignment other employees would have no grievance that their posting and selection rights (secured by the collective bargaining agreement) had been violated. To this point I am foursquare with my colleagues.

It seems, however, that the majority is intent on addressing the issue of how to balance rights where there *is* a conflict between the ADA and a collective bargaining agreement. To that end, the majority concludes that "there is a conflict, however minimal," Maj. Op. at 894, between the collective bargaining agreement's reassignment provision (section 14.5) and the ADA's reassignment because the ADA might require "a few more reassignments," Maj. Op. at 896–97, than section 14.5 of the collective bargaining agreement. Even if there were a slight inconsistency, however, it would not matter here. Indeed, the majority makes the very point. Maj. Op. at 897 (any inconsistency "appears to present very little difficulty for Aka's claim that the accommodation is 'reasonable'" and "appears to give Washington

Hospital very little purchase for any affirmative defense that the reassignment would impose an 'undue hardship.' "). I therefore take the majority's entire discussion of the balancing of rights under the ADA and a collective bargaining agreement to be dictum and, like all dictum, carrying the same baggage—unintended consequences in unknown circumstances.[7] For this reason, I disassociate myself from the unfortunate conflicts dictum.

\* \* \*

I respectfully dissent from the majority's reversal of summary judgment on the central pharmacy technician issue and otherwise concur in the judgment.

7. For example, the majority queries, "If one non-disabled employee entitled to a vacant position under the seniority system in the collective bargaining agreement must wait an extra day before receiving an identical assignment because the earlier vacancy was filled by a disabled employee pursuant to the ADA, would this entail the 'sacrifice' of 'rights' created in other employees under the agreement?" Maj. Op. at 896. This suggests that in assessing the reasonableness of accommodating a handicapped employee, the court must examine what impact reassignment of the handicapped employee would have on other individual employees. At this point the record contains no

evidence regarding the effect Aka's reassignment might have on individual employees but the majority states that there is "little difficulty" with Aka's claim that reassignment is reasonable because the ADA requirements could result in, at most, a few more handicapped reassignments than would the collective bargaining agreement. Maj. Op. at 896–97. But what if an "extra" reassignment permanently excludes another employee from a position he merits and would have otherwise received? According to the majority, is the impact on the non-handicapped employee relevant to reasonableness (or perhaps even determinative)? The majority's dictum—not surprisingly—does not provide the answer.